**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| RYNE SHETTERLY, derivatively on behalf of DOCGO INC., <br><br> Plaintiff, <br><br> v. <br><br> LEE BIENSTOCK, MICHAEL BURDIEK, ANTHONY CAPONE, STEVEN KATZ, VINA LEITE, ANDRE OBERHOLZER, NORMAN ROSENBERG, IRA SMEDRA, ELY D. TENDLER, JAMES M. TRAVERS, and STAN VASHOVSKY, <br><br> Defendants, <br><br> -and- <br><br> DOCGO INC., <br><br> Nominal Defendant. | Civil Action No.: <br><br><br> **VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT** <br><br> **DEMAND FOR JURY TRIAL** |

## INTRODUCTION

Plaintiff Ryne Shetterly ("Plaintiff"), by and through his undersigned counsel, derivatively on behalf of nominal defendant DocGo Inc. ("DocGo" or the "Company"), submits this Verified Stockholder Derivative Complaint against the Individual Defendants (defined herein) as officers and/or directors of DocGo for breaches of fiduciary duty, violations of Sections 10(b) and 21(D) of the Securities Exchange Act of 1934 (the "Exchange Act"); violations of Section 14(a) of the Exchange Act; unjust enrichment; waste of corporate assets; aiding and abetting breaches of fiduciary duty; insider selling and misappropriation of information; and indemnification. Plaintiff bases his allegations upon personal knowledge as to his own acts, and on information and belief as to all other allegations, based upon investigation by counsel, including, but not limited to, a

review and analysis of: (i) regulatory filings made by DocGo with the United States Securities and Exchange Commission ("SEC"); (ii) press releases issued and disseminated by DocGo; (iii) a securities class action lawsuit filed in the United Stated District Court for the Southern District of New York, captioned *Naclerio v. DocGo Inc. et al.*, No. 1:23-cv-09476 (S.D.N.Y.) (the "Securities Class Action"), alleging issuance of false and misleading statements of material fact and the omission of material facts necessary to make other statements made not misleading, between November 8, 2022 and January 10, 2024, both dates inclusive (the "Relevant Period") with respect to the Company's business, operations, and prospects; and (iv) other publicly available information, including media and analyst reports, concerning DocGo.

## NATURE OF THE ACTION

1.      This is a stockholder derivative action asserted on behalf of Nominal Defendant DocGo against certain officers and the members of the Company's Board of Directors ("Board") for the claims asserted herein to recover damages caused to the Company as described herein.

2.      DocGo provides mobile medical and transportation services in the United States and the United Kingdom.  Its suite of services includes mobile health services, virtual care management, and ambulance services.  In its 2022 Annual Report, the Company boasts that it "provide[s] [its] services in collaboration with leading healthcare organizations via long-term relationships that are intended to drive meaningful revenue, help provide efficient and effective capital allocation and create low-risk opportunities for significant growth."

3.      In response to an influx of several thousand international migrants and asylum seekers to New York City in the spring of 2023, New York City Mayor Eric Adams ("Mayor Adams") initiated a relocation policy to transport the migrants outside New York City.  New York City awarded DocGo a no-bid $432 million contract pursuant to an emergency order (the "Relocation Contract") to relocate the migrants.  The Relocation Contract purportedly took effect

on May 5, 2023,[1] and pursuant to it, DocGo was required to provide lodging, services, medical care, food, transportation, case management, and round-the-clock security to the migrants.  The $432 million Relocation Contract nearly matches the Company's total 2022 revenue of $440.5 million.  As alleged in detail herein, DocGo and its top executives deceived investors and the public about the Company's qualifications,[2] capabilities, and readiness to competently fulfill its obligations under this major contract.

4.      In quarterly earnings calls, press releases, and SEC filings leading up to and after being awarded the Relocation Contract, the Individual Defendants repeatedly overstated and exaggerated the efficacy and scope of DocGo's mobile-health and medical-transportation services. The Individual Defendants' statements had the effect of artificially inflating the Company's stock price and misrepresenting its preparedness to handle a contract of this magnitude and importance.

5.      The truth about DocGo's deficiencies and misrepresentations began to emerge in July 2023, when *The New York Times* published an exposé reporting on serious issues with DocGo's provision of migrant services in New York City, including its purported failure to adequately coordinate with local agencies and its hiring a private security firm that threatened and intimidated migrants in their care.

---

[1] https://www.nytimes.com/2023/09/06/nyregion/docgo-migrants-contract-adams.html.

[2] On November 7, 2022, DocGo announced that then-President Anthony Capone ("Capone") had been named the Company's new Chief Executive Officer ("CEO") effective January 1, 2023. In the press release announcing the news, Stan Vashovsky ("Vashovsky") CEO of DocGo, was quoted as praising Capone: "We are very fortunate to have someone with [Capone]'s skill set and track record to take the reigns as CEO next year, and I have every confidence in the continued growth and success of this company." DocGo filed an 8-K with the SEC ("Nov. 7, 2022 8-K") that same day in which it touted Capone's credentials: "Mr. Capone earned his undergraduate degree from the State University of New York College at Potsdam and his M.S. in Computer Science from Clarkson University." As alleged herein, the Company misled investors about Capone's qualifications at the direction of or while under the control of the Individual Defendants (defined below).

6.     Then, in September 2023, the *Albany Times Union* uncovered that DocGo's then-CEO Capone had falsified and misrepresented his educational background and credentials.

7.     The revelations culminated in a January 10, 2024 Fuzzy Panda Research Report ("FP Report") exposing the full scope of the Individual Defendants' misconduct.  The FP Report included not only the problems with the Relocation Contract, but it also showed that the Company had flouted its mission-critical health and safety duties.  For example, the FP Report explained that DocGo had covered up that its nurses "gave children dangerous and improper covid vaccines." It also revealed that DocGo had "[b]ill[ed] for covid tests that were not actually performed" and had turned a "'blind eye' to cheating on certification tests." The report also identified other issues, including that the Company claimed to be "a tech and AI company" even though Capone had lied about his technology degrees and even though "[t]he company's 'AI Subsidiary' in Estonia has only 1 full-time employee."

8.     Throughout the Relevant Period, the Individual Defendants failed to disclose multiple pieces of material information to stockholders.  Specifically, the Individual Defendants misled investors by withholding the following information from the Company's investors: (i) the Company's inadequate executive hiring processes did not fully review and vet the backgrounds and credentials of job candidates; (ii) DocGo's inadequate executive hiring processes made disruptive executive turnover more likely; (iii) DocGo overstated the efficacy of its mobile health and medical transportation services; (iv) DocGo ignored red flags on mission-critical health and safety issues, like falsely claiming to have performed Covid tests; (v) revelations of the foregoing were likely to harm the Company's reputation and subject it to significant regulatory scrutiny that would negatively impact its finances; and (vi) as a result, the Individual Defendants' positive

statements about the Company's business, operations, and prospects were materially false, misleading, and lacked a reasonable basis.

9.      As these damaging revelations came to light and DocGo faced intense public criticism and scrutiny as well as a targeted audit by the New York City Comptroller, the Company's stock price plummeted.

10.      As a direct and proximate result of the misconduct described herein by Individual Defendants, DocGo has sustained significant damages, ultimately resulting in its common stock losing more than 60% of its value between July 30, 2023 ($7.89 per share at close) and January 10, 2024 ($2.99 per share at close).

11.      As noted above, this loss in valuation was triggered by a series of revelations that, for the first time, disclosed the truth about previously released false and misleading statements:

(a)      a July 30, 2023 *The New York Times* article describing DocGo's series of failures under the Relocation Contract, including coordination issues, problematic reports of the Company's security guards repeatedly threatening migrants, and reports that finding steady work for the migrants had been largely unsuccessful;

(b)      the decision by New York City Comptroller, Brad Lander ("Comptroller Lander"), to decline to approve the Relocation Contract due to:

(i)      "[i]nsufficient budget detail,"

(ii)      "[i]nconclusive reasoning as to the selection of the vendor and contradictory statements about [DocGo's] fiscal ability to provide contracted services,"

(iii) "[i]nadequate vendor responsibility determination, contract oversight and subsequent questions about proper service deliver," and

(iv) "inadequate information regarding the selection of subcontractors" including for security guards;

(c) a September 14, 2023 *Albany Times Union* article revealing that Capone had falsified his educational history;

(d) Comptroller Lander's September 18, 2023 announcement that he would be conducting a real-time audit of DocGo's operations and invoices under the Relocation Contract; and

(e) a January 10, 2024 FP Report that exposed the full scope of the Individual Defendants' misconduct, including not only the problems with the Relocation Contract, but also identifying the Company's failures regarding mission-critical health and safety issues and misrepresentations about its status as a technology company.

12.     This action seeks to recover monetary damages to remedy the harm done to the Company and to obtain corporate governance reforms to protect DocGo and its stockholders from a recurrence of the harmful events described herein.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because the Complaint raises a federal question under Sections 10(b) and 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.  The Court has supplemental jurisdiction over the pendent state law claims pursuant to 28 U.S.C. § 1367(a) because the state law claims form part of the same

case or controversy.  This action is not a collusive one designed to confer jurisdiction on a court of the United States that it would not otherwise have.

14.     This Court has jurisdiction over each Defendant because they reside in this District or have sufficient minimum contacts with this District to render the exercise of jurisdiction by the Court permissible under traditional notions of fair play and substantial justice.  The Court has personal jurisdiction over the Nominal Defendant because it is authorized to do business in this state and has consented to service in this state.

15.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial portion of the transactions and wrongs complained of herein, including the Defendants' primary participation in the wrongful acts detailed herein and violation of fiduciary duties owed to DocGo. Venue is also proper pursuant to 28 U.S.C. § 1401 because Nominal Defendant DocGo could have sued the same Defendants in this District.

## PARTIES

16.     Plaintiff is a DocGo stockholder and has continuously held DocGo stock from the time of the wrongdoing alleged herein until the present.  Plaintiff will fairly and adequately represent DocGo's interest in this action.

17.     Nominal Defendant DocGo is incorporated under the laws of Delaware, and its principal executive offices are located at 35 West 35th Street, Floor 6, New York, New York. DocGo's common stock trades on the Nasdaq exchange under the symbol "DCGO."

18.     Defendant Lee Bienstock ("Bienstock") has been a member of the Board since November 2021 and has served as the Company's CEO since September 2023.  Previously, he served as the Company's Chief Operating Officer ("COO") and President.

19.     Defendant Michael Burdiek ("Burdiek") has been a member of the Board since November 2021 and has served as a member of the Audit Committee since at least April 2022.

20.     Defendant Capone served as CEO of the Company from at least January 2023 until he resigned in September 2023.  He has been a consultant for the Company since October 2023. He previously served as the Company's President from November 2021 to December 2022.

21.     Defendant Steven Katz ("Katz") has been a member of the Company's Board since November 2021 and has been Chair of the Board since April 1, 2024.  He has also been the Lead Independent Director since April 2023.  He has served as the Chair of the Audit Committee since at least April 2022 and as a member of the Compensation Committee and Nominating & Corporate Governance Committee ("Governance Committee") since at least April 2022.

22.     Defendant Vina Leite ("Leite") has been a member of the Board since November 2022 and has served as a member of the Governance Committee and Compensation Committee since April 2023.

23.     Defendant Andre Oberholzer ("Oberholzer") has served as the Company's Executive Vice President of Strategy since September 2023.  Before then, he served as Treasurer and Executive Vice President of Capital Markets and Strategy from at least December 2022 to September 2023, and as the Company's Chief Financial Officer ("CFO") from November 2021 to December 2022.

24.     Defendant Norman Rosenberg ("Rosenberg") has served as the Company's CFO since at least January 2023.  In September 2023, he was appointed to the additional role of Treasurer.

25.     Defendant Ira Smedra ("Smedra") has served as a member of the Board since 2021. Smedra has served as a member of the Audit Committee since at least April 2022.  He has served as the Chair of the Governance Committee and Compensation Committee since at least April 2022.

26.     Defendant Ely D. Tendler ("Tendler") has served as a member of the Board since November 2021.  He is also the Company's Secretary and the Company's General Counsel, a position he has held since 2015.

27.     Defendant James M. Travers ("Travers") has served as a member of the Board since November 2021.

28.     Defendant Stan Vashovsky ("Vashovsky") is the Co-Founder of DocGo and served as CEO from the Company's founding in 2015 until retiring from that position effective December 31, 2022.  He served as Chairman of the Board since the Company's founding and served as a member of the Board since November 2021 until he stepped down on March 31, 2024.

29.     The following defendants are collectively referenced herein as the "Individual Defendants": Bienstock, Burdiek, Capone, Katz, Leite, Oberholzer, Rosenberg, Smedra, Tendler, Travers, and Vashovsky.

30.     The following Individual Defendants are collectively referenced herein as the "Director Defendants": Bienstock, Burdiek, Katz, Leite, Smedra, Tendler, Travers, and Vashovsky.

31.     The following Individual Defendants are collectively referenced herein as the "Audit Committee Defendants": Burdiek, Katz, and Smedra.

32.     The following Individual Defendants are collectively referenced herein as the "Governance Committee Defendants": Katz, Leite, and Smedra.

33.     The following Individual Defendants are collectively referenced herein as the "Securities Class Action Defendants": Bienstock, Capone, Oberholzer, Rosenberg, and Vashovsky.

34.     The following Individual Defendants are collectively referenced herein as the "Insider Trading Defendants": Bienstock, Capone, Oberholzer, Tendler, and Travers.

35.     The Individual Defendants and Nominal Defendant are collectively referenced herein as "Defendants."

## THE INDIVIDUAL DEFENDANTS OWE FIDUCIARY DUTIES TO THE COMPANY AND ITS STOCKHOLDERS

36.     At all times relevant to this case, the conduct of the Individual Defendants was governed by well-recognized rules to protect the Company and its stockholders, the members of the public who had invested in DocGo.

37.     Because of their positions as officers and/or directors of the Company and their ability to control its business and corporate affairs, the Individual Defendants owed the Company and its stockholders the fiduciary obligations of good faith, loyalty, and candor and were at all relevant times required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner.

38.     The Individual Defendants were at all relevant times required to act in furtherance of the best interests of the Company and its stockholders to benefit all stockholders equally and not in furtherance of their personal interest or benefit.

39.     Each of the Company's directors owes to the Company and its stockholders fiduciary duties of care and loyalty, including good faith, oversight, and candor, to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.

40.     Because of their positions of control and authority as directors and/or officers of the Company, the Individual Defendants were able to and did, directly or indirectly, exercise control over the wrongful acts alleged herein.

41.     To discharge their duties, the Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company.

42.     By virtue of such duties, the officers and directors of DocGo were required to do the following:

- Ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority under all applicable federal, state, and local laws, rules, and regulations, including disseminating truthful and accurate statements to the SEC and the investing public;

- Conduct the affairs of the Company in a lawful, efficient, and business-like manner to make it possible for the Company to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

- Properly and accurately inform investors and analysts as to the true financial condition of the Company at any given time, make accurate statements about the Company's financial results and prospects, and ensure that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

- Remain informed as to how the Company conducted its operations, and, upon notice of imprudent or unsound conditions or practices, make reasonable inquiry into the nature and cause of such conditions and

practices, correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws; and

- Ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, rules, and regulations.

43. The Individual Defendants knowingly violated their obligations as directors and officers of the Company, acting without good faith and consciously disregarding their duties to the Company and its stockholders despite their knowledge of the risk of serious injury to the Company.

44. Because of their positions of control and authority, the Individual Defendants were able to exercise control over the wrongful acts complained of herein, as well as the content of the various public statements issued by DocGo.

45. In addition to these general duties, the Individual Defendants were also at all relevant times bound by DocGo's corporate governance documents.

***DocGo's Code of Business Conduct & Ethics***

46. The Board has adopted a Code of Business Conduct and Ethics (the "Code of Conduct") to deter wrongdoing, which imposes additional duties and responsibilities on the Individual Defendants as described below.

47. The Code of Conduct's "Introduction" section states that the Company "expect[s] all individuals associated with the Company to conduct themselves with the highest degree of honesty and integrity at all times."

48. The Code of Conduct includes a "Legal Compliance" section, which states the following, in pertinent part: "The Company conducts its affairs consistent with the applicable laws and regulations of the United States and the states and foreign jurisdictions in which it does business, and adherence to all legal and regulatory requirements is among our highest priorities,"

and "[a]s a Company director or employee, you are expected to comply with all such applicable laws and regulations."

49.     The Code of Conduct further includes a "Prohibition Against Discrimination, Equal Opportunity Employment" section, which states, in pertinent part:

> The Company is committed to maintaining the highest integrity in our work environment.  Our employees must comply with all applicable employment laws and our policies addressing workplace conduct.  We base hiring, promotions and performance management decisions on qualifications and job performance.  The Company's policy is to treat each employee and job applicant without regard to race, color, age, sex, religion, national origin, sexual orientation, ancestry, veteran status or any other category protected by law.  Employees must refrain from acts that are intended to cause, or that do cause, unlawful employment discrimination.  The Company also accommodates qualified disabled employees and applicants consistent with applicable laws.  The Company prohibits harassment in the workplace, including but not limited to sexual harassment.  Consistent with this policy, we will not tolerate harassment by any of our employees, customers or other third parties.  Harassment includes verbal or physical conduct which threatens, offends or belittles any individual because of his or her gender identity, race, color, age, religion, national origin, sexual orientation, ancestry, veteran status or any other category protected by law.  Retaliation against an employee for alleging a complaint of harassment or discrimination or for participating in an investigation relating to such a complaint will also not be tolerated.

50.     Additionally, the Code of Conduct includes a "Health and Safety" section, which states, in pertinent part:

> The Company is committed to providing a safe and healthy work environment for its employees, and all other individuals working on behalf of the Company.  The Company also recognizes that the responsibilities for a safe and healthy work environment are shared with you.  The Company will continue to establish and implement appropriate health and safety policies that managers and their employees are expected to uphold at all times.  You are expected to conduct your work in a safe manner in compliance with all Company policies and report all safety or health concerns to your manager or Human Resources.

### DocGo's Principles of Corporate Governance

51.     The Board has also adopted Principles of Corporate Governance (the "Governance Principles") to deter wrongdoing.  The Governance Principles impose additional duties and responsibilities on the Individual Defendants, including:

The Board, which is elected by the Company's stockholders, oversees the management of the Company and its business. The Board selects the senior management team, which is responsible for operating the Company's business, and monitors the performance of senior management. Consistent with the oversight function of the Board, the Board's core responsibilities include:

- Assessing the performance of the Chief Executive Officer (the "CEO") and other senior management and setting their compensation;

- Planning for CEO and senior management succession and overseeing senior management development;

- Reviewing the Company's strategies and monitoring their implementation and results;

- Overseeing the integrity of the Company's financial statements and the Company's financial reporting process;

- Overseeing the Company's processes for assessing and managing risk;

- Overseeing legal and regulatory compliance;

- Engaging in succession planning for the Board and key leadership roles on the Board and its committees;

- Nominating the Company's director candidates and appointing committee members;

- Shaping effective corporate governance; and

- Providing advice and counsel to management regarding significant issues facing the Company and reviewing and approving significant corporate actions.

52.     The Governance Principles also explain the factors the Governance Committee considers when making recommendations to the Board:

The Board determines the appropriate size of the Board from time to time. A substantial majority of the Board is made up of independent directors. An "independent" director is a director who meets the Nasdaq Stock Market definition of independence, as determined by the Board. The Board makes an affirmative determination regarding the independence of each director annually, based upon the recommendation of the Nominating [& Governance] Committee.

The Nominating [& Governance] Committee considers and makes recommendations to the Board regarding the size, structure, composition and

14

functioning of the Board.  In addition, the Nominating [& Governance] Committee is responsible for establishing and overseeing processes and procedures for the selection and nomination of directors, and for developing and recommending Board membership criteria to the Board for approval and periodically reviewing these criteria.  The Board's criteria include leadership experience, financial expertise and industry knowledge.  The Committee evaluates the composition of the Board annually to assess the skills and experience that are currently represented on the Board as a whole, and in individual directors, as well as the skills and experience that the Board may find valuable in the future.  The Board and the Nominating Committee actively seek to achieve a diversity of occupational and personal backgrounds on the Board, including diversity with respect to demographics such as gender, race, ethnic and national background, geography, age and sexual orientation.

The Nominating [& Governance] Committee reviews the qualifications of director candidates and incumbent directors in light of criteria approved by the Board and recommends the Company's candidates to the Board for election by the Company's stockholders at the annual meeting.  The Committee also considers director candidates recommended by Company stockholders in accordance with the procedures set forth in the proxy statement.

### *Director Defendants On Particular Committees Owe Additional Duties*

### *DocGo's Audit Committee Charter*

53.     DocGo's Audit Committee Charter ("Audit Charter") imposes additional duties on members of the Audit Committee, which consisted of Burdiek, Katz, and Smedra during the Relevant Period.  The Audit Charter sets forth the Audit Committee's purpose:

The purpose of the Committee, at a minimum, must be to:

- represent and act on behalf of the Board in discharging its oversight responsibility relating to: (a) the accounting and financial reporting processes of the Company, including the audits of the Company's financial statements and the integrity of the financial statements; (b) the Company's compliance with ethical, legal and regulatory requirements; (c) the outside auditor's qualifications and independence and (d) the performance of the Company's internal audit function and outside auditor; and

- oversee the preparation of the report of the Committee required by the SEC Rules to be included in the Company's annual proxy statement.

54.     The Audit Charter sets forth the specific duties and responsibilities of the Audit

Committee and its members:

(a) Be directly responsible, in its capacity as a committee of the Board, for the appointment, compensation, retention and oversight of the work of the outside auditor.  In this regard, the Committee will appoint, retain, compensate, evaluate and terminate, when appropriate, the outside auditor, who will report directly to the Committee.

(b) At least annually, obtain and review a report by the outside auditor describing: (1) the outside auditor's internal quality-control procedures and (2) any material issues raised by the most recent internal quality-control review or peer review or by any inquiry or investigation by any governmental or professional authorities, within the preceding five years, relating to one or more independent audits carried out by the outside auditor, and any steps taken to deal with any such issues.

*    *    *

(f) Meet to review and discuss with management and the outside auditor the annual audited and quarterly unaudited financial statements of the Company (including the Company's specific disclosures under the "Management's Discussion and Analysis of Financial Condition and Results of Operations" sections) and the independent auditor's reports related to the financial statements.

(g) Recommend to the Board based on the review and discussion described in paragraphs (d) - (f) above, whether the annual audited financial statements should be included in the Company's Annual Reports on Form 10-K.

(h) Receive reports from the outside auditor and management regarding, and review and discuss the adequacy and effectiveness of, the Company's internal controls, including any significant deficiencies in internal controls and significant changes in internal controls reported to the Committee by the outside auditor or management.

(i) Receive reports from management regarding, and review and discuss the adequacy and effectiveness of, the Company's disclosure controls and procedures.

*    *    *

(l) Review and discuss earnings press releases and corporate practices with respect to earnings press releases and financial information and earnings guidance provided to analysts and ratings agencies.

(m) Review and discuss the Company's practices with respect to risk assessment and risk management, and risks related to matters including the Company's financial statements and financial reporting processes, compliance, and information technology and cybersecurity.

(n) Oversee the Company's Compliance Program with respect to legal and regulatory requirements, including the Company's code(s) of conduct and policies and procedures for monitoring compliance; and[], meet to review the implementation and effectiveness of the Company's Compliance Program with the Chief Compliance Officer, who shall have the authority to communicate directly to the Committee, promptly, about actual and alleged violations of law or the Company's code(s) of conduct, including any matters involving criminal or potential criminal conduct.

(o) Establish and oversee procedures for handling reports of potential misconduct, including: (1) violations of law or the Company's code(s) of conduct; (2) complaints regarding accounting, internal accounting controls, auditing and federal securities law matters; and (3) the confidential, anonymous submission of concerns by employees regarding accounting, internal accounting controls, auditing and federal securities law matters.

(p) Establish and periodically review policies and procedures for the review, approval and ratification of related person transactions (as defined in applicable SEC Rules), review related person transactions, and oversee other related party transactions governed by applicable accounting standards.

***DocGo's Nominating & Corporate Governance Committee Charter***

55.     DocGo's Nominating & Corporate Governance Committee Charter ("Governance Charter") imposes additional duties on members of the Governance Committee, which consisted of Katz, Leite, and Smedra during the Relevant Period.

56.     The Governance Charter sets forth the Governance Committee's purpose as: "identify[ing] individuals qualified to become members of the Board (consistent with criteria approved by the Board), recommend[ing] director candidates to the Board[,] and perform[ing] a leadership role in shaping the Company's corporate governance."

57.     The Governance Charter sets forth specific duties and responsibilities of the Governance Committee and its members, including:

[T]he [Governance] Committee will:

(a) Periodically review and recommend to the Board, the skills, experience, characteristics, and other criteria for identifying and evaluating directors.

\* \* \*

(c) Identify, review the qualifications of and recruit director candidates for election to the Board.

(e) Assess the qualifications, contributions and independence of incumbent directors in determining whether to recommend them for reelection to the Board.

(f) Discuss succession planning for the Board and key leadership roles on the Board and its committees.

\* \* \*

(j) Develop and recommend to the Board a set of corporate governance principles, annually review these principles and recommend changes to the Board as appropriate.

\* \* \*

(n) Review and assess the channels through which the Board receives information, and the quality and timeliness of the information received.

(o) Oversee and make recommendations to the Board regarding sustainability matters relevant to the Company's business, including Company policies, activities, and opportunities.

**DEFENDANTS BREACH THEIR DUTIES
TO THE COMPANY AND ITS STOCKHOLDERS**

58.     Through a series of communications, the Individual Defendants made materially false and misleading statements and failed to disclose material adverse facts about the Company's business, operations, and prospects.

*The November 7, 2022 8-K and Press Release*

59.     On November 7, 2022, DocGo filed an 8-K with the SEC ("Nov. 7, 2022 8-K") and

issued a post-market press release ("Nov. 7, 2022 PR") announcing that the Board had selected

Capone as the new CEO.  The Nov. 7, 2022 8-K stated, in pertinent part:

> On November 6, 2022, Stan Vashovsky notified the Board of Directors of the
> Company (the "Board") that he intends to retire from the Company and step down
> as the Company's Chief Executive Officer, director and Chairman of the Board,
> effective as of December 31, 2022 (the "Effective Time").  In connection with Mr.
> Vashovsky's retirement, the Board appointed Anthony Capone, the Company's
> current President, to succeed Mr. Vashovsky as the Chief Executive Officer of the
> Company, effective upon the Effective Time.  Mr. Capone will no longer serve as
> the Company's President as of such time.  Mr. Vashovsky will continue to consult
> with the Company through 2023 pursuant to a transition agreement expected to be
> entered between Mr. Vashovsky and the Company, the terms of which agreement
> shall be disclosed following such time.
>
> Mr. Capone, age 35, has served as the Company's President since November 2021.
> Mr. Capone previously held various positions at Ambulnz, Inc. between 2017 and
> 2021, including those of President, Chief Technology Officer and Chief Product
> Officer.  Prior to Ambulnz, Mr. Capone served as the Chief Executive Officer,
> Chief Technology Officer and Head of Sales at Fundbase, an investment platform,
> from 2015 to 2017.  From 2011 to 2013, Mr. Capone served as the lead software
> engineer at Constant Contact, Inc., an online marketing company.  **Mr. Capone
> earned his undergraduate degree from the State University of New York College
> at Potsdam and his M.S. in Computer Science from Clarkson University**.[3]

60.     The Nov. 7, 2022 PR further stated:

> Stan Vashovsky, CEO of DocGo, commented, "I am extremely proud of what we
> have been able to accomplish as a company these past seven years, introducing an
> entirely novel way of **delivering quality care** that is beneficial to both patients and
> payers alike.  **We are very fortunate to have someone with Anthony's skill set and
> track record to take the reigns as CEO next year, and I have every confidence in
> the continued growth and success of this company.**"
>
> Anthony Capone, President of DocGo, stated, "By nearly any measure, our
> performance during the third quarter was significant validation of our unique tech-
> enabled model and the unmet needs that we are addressing with our mobile health
> and transportation solutions.  **We continue to gain share in our key territories,
> both in the US and UK, while also entering new markets, and I believe we are
> very well positioned to maintain the momentum that we currently enjoy**.  We are

---

[3] Unless otherwise noted, all emphasis is added.

19

in a very strong financial position, with $179.4 million of total cash and equivalents as of September 30th, plus the recently announced $90 million line of credit that we announced with Citi, which remains undrawn.  I anticipate a strong finish to the year and a catalyst-rich 2023 driven by continued strong organic growth and possible opportunistic acquisitions that expand our offering or geographic reach."

***The December 6, 2022 Press Release***

61.     On December 6, 2022, DocGo issued another press release ("Dec. 6, 2022 PR").

The Dec. 6, 2022 PR stated in pertinent part:

DocGo (Nasdaq: DCGO), a leading provider of last-mile mobile health services, today announced the release of its annual Social Impact and Sustainability Report. The report provides an overview of the progress DocGo has made across a range of Environmental, Social, and Governance (ESG) programs.

"***DocGo was founded with a mission to serve the public and improve the overall quality of healthcare like no other company has before,*** *" said Stephen Sugrue, DocGo's Chief Compliance Officer.  "**We have acted diligently beyond our innovative care model as we build on our fundamentals and take a significant step forward in our sustainability journey*** of creating a better way of life.  I am immensely proud of our ambition and leadership to deliver better results for our people, communities and environment."

***The March 14, 2023 10-K & Attached Certifications and the Q4 2022 Earnings Call***

62.     On March 14, 2023, DocGo filed its Annual Report on Form 10-K with the SEC for the year ended December 31, 2022 ("2022 10-K").  The 2022 10-K stated in pertinent part:

**Our Company**

DocGo, Inc. ("DocGo," "we," "us," "our" and "the Company") aims to redefine access to healthcare.  We strive to deliver high-quality, cost-effective healthcare mobility solutions and unlock the further promise and potential of telehealth treatment through our "last-mile" care capabilities.  We do so by leveraging our proprietary technology platform powered by artificial intelligence ("AI"), and our network of healthcare professionals, which has provided service in 29 states and in the United Kingdom.  We often provide our services in collaboration with leading healthcare organizations, via long-term relationships that are intended to drive meaningful revenue, help provide efficient and effective capital allocation and create low-risk opportunities for significant growth.

Our mission is to provide high quality, highly accessible healthcare for all, empowering the delivery of medical transportation and mobile healthcare outside the traditional "brick-and-mortar" facilities, with more accessible, affordable, and

efficient patient-centered care.  Since our founding in 2015, through more than 8 million patient interactions, we have created a care delivery model that helps provide better care outside of the physical walls of the healthcare system.  We began by developing a state-of-the-art, intuitive platform designed to drive greater efficiency and improved access to patient care.  Our innovative technology can change the way healthcare facilities manage patient transportation and eliminate many of the common obstacles faced when scheduling service, ultimately freeing medical professionals to focus more time and their valuable resources on what they do best — providing patient care.  Additionally, in certain markets, our Mobile Health in-person care model facilitates medical treatment directly to patients in the comfort of their homes, workplaces, and other non-traditional locations.  Working under the guidance of prescribing physicians, our network (which includes both company employees and personnel from a variety of subcontracted labor agencies and some independent contractors) of more than 5,000 medical clinicians including Emergency Medical Technicians ("EMTs"), paramedics, licensed practical nurses ("LPNs"), registered nurses ("RNs") Advanced Practice Providers ("APPs") and support staff, provides a wide range of tests, procedures and interventions that previously required a visit to a traditional healthcare setting.

*    *    *

***Our Segments***

***Mobile Health Solutions***

The traditional healthcare model requires patients to interact with many levels of healthcare providers — including receptionists, nurses, lab technicians and physicians — for even the most routine tests, procedures and interventions.  We recognized that a number of these services could easily be performed by EMTs, paramedics and LPNs under the guidance of physicians, but in the comfort of a patient's home or workplace.  Our patient-centered approach helps limit the need for individuals to seek routine treatment in more expensive and environmentally exposed, less comfortable settings such as emergency departments and urgent care clinics.  In addition to providing greater convenience to patients, our Mobile Health solutions help reduce unnecessary burdens on healthcare systems, by freeing up their finite, in-person resources to address more urgent and critical patient needs.  DocGo's Mobile Health clinical services, which we expanded into the home and workplace in 2020, facilitate medical care via a turnkey suite of integrated, "lastmile" solutions.  Through DocGo On-Demand and additional Mobile Health programs including expanded population offerings, we provide holistic health, social and shelter coordination services to underserved communities. . . .

*    *    *

As patients seek more efficient, more convenient healthcare options, we believe our virtual care-enabling solutions are poised for significant growth, by delivering in-person patient care previously inaccessible outside of the more

traditional healthcare settings.  We partner with leading national health systems, insurance carriers, private organizations and employers, state and local governments and managed care organizations, to provide our Mobile Health solutions, including NYC Health + Hospitals, New York City Department of Homeless Services, Dollar General, and Mount Sinai Health System.  For the fiscal year ended December 31, 2022, we generated approximately 74.0% of our revenues from the solutions provided by our Mobile Health segment. . . .

\*    \*    \*

### Transportation Services

DocGo's digitally enabled medical mobility solutions are offered under the Ambulnz brand.  We help provide reliable, efficient access to local clinical services, including primary and specialty care, dialysis treatments for chronic care management, and transfers between clinical settings.  Every vehicle in our fleet is equipped with our proprietary technology platform, which is integrated with some of the nation's largest electronic medical record ("EMR") systems.

This integration is designed to provide seamless transfer of electronic patient information and discharge data to our healthcare provider customers, which helps improve order speed and accuracy, and helps eliminate a myriad of manual processes.  Consequently, our healthcare facility customers are better able to order, track and manage transportation requests and patient movement, thereby enhancing utilization of resources and cost.  Our ShareLinkTM technology is designed to provide our healthcare partners and patients with real-time vehicle locations and accurate estimated time of arrivals and helps deliver valuable peace of mind.  As of December 31, 2022, we had 381 ambulances in service throughout the United States, and more than 300 in the United Kingdom.  For the fiscal year ended December 31, 2022, we generated approximately 26.0% of our revenues from this segment.

### Human Capital Resources

We strive to hire the best talent across our industry, with a focus on inspiring performance.  As of December 31, 2022, we had over 3,200 employees, including healthcare professionals, field management personnel and corporate support staff, as represented in the table below.  Healthcare professionals consist of EMTs, paramedics, LPNs, RNs, APPs, clinicians and related support staff; field management personnel includes supervisors and managers; and corporate support staff includes software development, billing, finance, sales, marketing, and executives.

| | Full-time | Part-time | Total |
|---|---|---|---|
| Healthcare Professionals | 1,570 | 1,180 | 2,750 |
| Field Management | 138 | 3 | 141 |
| Corporate Support | 356 | 5 | 361 |
| Total | 2,064 | 1,188 | 3,252 |

None of our employees are represented by a labor union or subject to any collective bargaining agreement.  In addition to the employees above, as of December 31, 2022, the Company engaged the services of approximately 2,135 people, primarily in the healthcare professional area, through a variety of subcontracted labor agencies and some independent contractors.

***Recruiting***

We consider our employees to be our most valuable assets.  Our employee experience begins with identifying and attracting people who embody our core values and share our vision to provide high-quality patient care.  We are committed to building a company that our employees are proud to be a part of, and fostering an environment in which our employees can grow, evolve and discover their existing and untapped potential.  We believe our focused approach to recruiting and developing talent allows us to attract strong candidates to continue growing and scaling our business.

63.     Attached to the 2022 10-K were certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Capone and Rosenberg attesting that the "financial information included in this [2022 10-K], fairly present[s] in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in [the 2022 10-K]."

64.     Also on March 14, 2023, DocGo hosted an earnings call with investors and analysts to discuss the Company's fourth-quarter financial results for 2022 ("Q4 2022 Earnings Call"). During the call, Bienstock stated in pertinent part:

We were very pleased to recently announce a number of successful contract wins and we continue to pursue large opportunities that are working their way through the RFP process.

\*     \*     \*

In addition, our leased hour reimbursement model provides downside margin protection, mitigating our exposure to demand risk.  Our recent success in the RFP

23

channel and growing interest in DocGo services across the country highlights the attractiveness of our value proposition to customers.

*April 26, 2023 Proxy Statement*

65.     On April 26, 2023, DocGo filed a Schedule 14A with the SEC ("2023 Proxy Statement").   The Director Defendants solicited the 2023 Proxy Statement, which was filed pursuant to Section 14(a) of the Exchange Act.   The 2023 Proxy Statement contained material misstatements and omissions.

66.     The 2023 Proxy Statement asked DocGo stockholders to, among other things, vote to elect Leite and Travers as Class II director nominees to the Board to serve for a three-year term until the 2026 Annual Meeting of Stockholders and until their respective successors have been duly elected and qualified or until their earlier resignation, death, disqualification or removal.   The Board nominated Leite and Travers as the Class II director nominees.

67.     The 2023 Proxy Statement provided the following materially misleading biography of Capone:

> Mr. Capone has served as our Chief Executive Officer since January 2023.   He previously served as our President from November 2021 to December 2022, during which time, he was an operational lead for our COVID-19 response across the U.S., including our work with FEMA's New York State COVID-19 deployment.   Mr. Capone previously served as Amblunz's President, Chief Technology Officer and Chief Product Officer from 2017 until our Business Combination.   Prior to Ambulnz, Mr. Capone served as the Chief Executive Officer, Chief Technology Officer and Head of Sales at Fundbase, an investment platform, from 2015 to 2017. From 2011 to 2013, Mr. Capone served as the lead software engineer at Constant Contact, Inc., an online marketing company.   Mr. Capone also founded the largest free developer conference in the U.S., Engineers4Engineers.   ***Mr. Capone earned his undergraduate degree from the State University of New York College at Potsdam and his M.S. in Computer Science from Clarkson University.***

68.     The 2023 Proxy Statement was also false and misleading because it proclaimed that the Company used innovative technology and quality patient care and because it represented that

DocGo's professionals were certified without mentioning that many had cheated on certification tests:

> DocGo is disrupting the traditional four-wall healthcare system **by providing high quality, highly affordable care to patients** where and when they need it.  DocGo's **innovative technology** and dedicated field staff of **certified health professionals** elevate the quality of patient care and drive business efficiencies for facilities, hospital networks and health insurance providers.

**The May 8, 2023 Press Release**

69. On May 8, 2023, DocGo issued a press release ("May 2023 PR") announcing the Company's first-quarter results.

70. In the May 2023 PR, DocGo provided a list of "Select Corporate Highlights"—including the following statement: "DocGo was awarded a large, statewide population health contract covering a substantial number of lives in New York."

71. The May 2023 PR also contained the following quote from Capone:

> We are very pleased with our continued operational execution, increase in backlog and growth in our RFP channel during the quarter.  In addition, we recently signed agreements to make our remote patient monitoring, chronic care management and mobile urgent care services available to a major kidney care company, a large durable medical equipment provider and numerous large cardiology practices. These agreements are expected to provide us with access to large pools of qualified Remote Patient Monitoring and Chronic Care Management patients for whom DocGo is uniquely designed to service remotely, driving down payor costs and improving patient outcomes.  We believe that the total addressable market opportunity is substantial, and we are excited to roll out these offerings over the remainder of the year.

72. The statements referenced above in the Nov. 7, 2022 8-K and PR; the Dec. 6, 2022 PR; the 2022 10-K; the SOX certifications; the Q4 2022 Earnings Call; the 2023 Proxy Statement, and the May 8, 2023 PR were materially false and misleading because the Individual Defendants made false and misleading statements and failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, the Individual Defendants made false and misleading statements and failed to disclose that: (i) the Company's inadequate executive

hiring processes did not fully review and vet the backgrounds and credentials of job candidates; (ii) DocGo's inadequate executive hiring processes made disruptive executive turnover more likely; (iii) DocGo overstated the efficacy of its mobile health and medical transportation services; (iv) DocGo ignored red flags on mission-critical health and safety issues, like falsely claiming to have performed Covid tests, (v) revelations of the foregoing were likely to harm the Company's reputation and subject it to significant regulatory scrutiny that would negatively impact its finances; and (vi) as a result, the Individual Defendants' positive statements about the Company's business, operations, and prospects were materially false, misleading, and lacked a reasonable basis.

## THE INSIDER TRADING DEFENDANTS SELL COMPANY STOCK AT ARTIFICIALLY INFLATED PRICES

73.     During the period of wrongdoing described above, the Insider Trading Defendants sold Company stock while it was trading at artificially inflated prices due to the false and misleading statements alleged herein and while they were in possession of material non-public Company information:

- On March 28, 2023, Bienstock sold 17,530 shares at $8.52 per share. Then, on August 16, 2023, Bienstock sold 1,667 shares at $10.19 per share.  These sales resulted in 19,197 total shares sold and $166,342.33 in total proceeds.

- On August 16, 2023, Capone sold 15,000 shares at $10.01 per share. Then on June 8, 2023, Capone sold 5,400 at $9.50 per share.  Finally, on September 1, 2023, Capone sold 2,000 shares at $9.00 per share. These sales resulted in 22,400 total shares sold and $219,450 in total proceeds.

- On May 23, 2023, Oberholzer sold 7,595 shares at $9.11 per share. On May 24, 2023, Oberholzer sold 40,000 shares at $9.14 per share. On May 25, 2023, he sold 300 shares at $9.07 per share. On May 30, 2023, he sold 16,271 shares at $9.02 per share. On May 31, 2023, he sold 22,366 shares at $9.01 per share. On June 1, 2023 he sold 42,497 shares at $9.07 per share. On August 14, 2023 he sold 50,000 shares at $10.15 per share. Finally, on August 15, 2023, he sold 79,029 shares. These sales resulted in 258,058 total shares sold and $2,495,110.89 in total proceeds.

- On August 22, 2023, Tendler sold 10,000 shares at $8.75 per share, resulting in $87,500 in total proceeds.

- On May 16, 2023, Travers sold 60,000 shares at $8.55 per share. On May 17, 2023, Travers sold 65,000 shares at $8.51 per share. These sales resulted in 125,000 total shares sold and $1,066,150 in total proceeds.

74. While many of the Company's stockholders lost significant amounts of money with the share price dropping substantially, the Insider Trading Defendants sold their shares at artificially high prices and avoided the staggering losses suffered by public stockholders.

75. As a result, the Insider Trading Defendants benefitted from the artificial inflation of the price of the Company's stock and the resulting increase in the value of DocGo's stock and stock options they held.

## **THE TRUTH EMERGES**

76.     More than eight months after the Individual Defendants started misleading the investing public, the truth about the Company began to emerge.  This information was revealed piecemeal from July 30, 2023 to January 10, 2024.

77.     First, on July 30, 2023, *The New York Times* published an article describing DocGo's efforts under the Relocation Contract and detailing a series of failures, including lack of coordination between the Company and local agencies, problematic reports of the Company's security guards repeatedly threatening migrants, and reports that finding steady work for the migrants had been largely unsuccessful.

78.     On this news, DocGo's stock price fell from an opening price of $8.50 per share on July 31, 2023 to a low of $7.89 per share later that day—a 7.18% decrease.

79.     Second, on September 6, 2023, Comptroller Lander declined to approve the Relocation Contract—the first time during his term that his office had done so regarding an emergency contract.  He provided four reasons for his decision: (i) "[i]nsufficient budget detail," (ii) "[i]nconclusive reasoning as to the selection of the vendor and contradictory statements about [DocGo's] fiscal ability to provide contracted services," (iii) "[i]nadequate vendor responsibility determination, contract oversight and subsequent questions about proper service delivery," and (iv) "inadequate information regarding the selection of subcontractors" including for security guards.

80.     On this news, DocGo's stock price fell from a closing price of $8.17 per share on September 5, 2023 to a closing price of $7.55 per share on September 6, 2023—a 7.59% decrease.

81.     Third, on September 14, 2023, an *Albany Times Union* article revealed that Capone had provided false information about his educational history.  The next day, Friday, September 15, 2023 at 5:26 PM—only minutes before the 5:30 cutoff for SEC filing for the

weekend—the Company filed a Form 8-K with the SEC announcing Capone's resignation as CEO and "from all other positions with the Company due to personal reasons."

82.     On this news, DocGo's stock price fell from a closing price of $6.46 per share on September 14, 2023 to a closing price of $5.70 per share on September 15, 2023—an 11.76% decrease.

83.     On September 18, 2023, Comptroller Lander issued a press release announcing a new real-time audit to examine the oversight of the operations and invoices incurred by DocGo under the Relocation Contract:

> New York City Comptroller Brad Lander today announced he will immediately commence a first-of-its-kind audit of the oversight of the operations and invoices incurred by DocGo, Inc., the medical services company hired by the city to provide shelter services to new arrivals in the city and upstate.  In a new letter sent to the Department of Housing Preservation and Development (HPD), Lander noted his office has "serious concerns about the selection of this vendor and its performance of contract duties," adding that "agencies must seek to obtain as much competition in vendor selection as is practicable" and "ensure that selected vendors have the requisite expertise and wherewithal to perform as required under the contract."

> Earlier this month, the office declined to approve the no-bid $432 million contract due to outstanding questions about how this vendor was selected and is performing its duties.

> "There are just too many outstanding questions and concerns about DocGo and this $432 million no-bid contract," said Comptroller Brad Lander.  "New Yorkers deserve real-time oversight and accountability to understand how this price tag was reached, ensure this company has the experience to provide the contracted services, and vet the integrity and responsibility of this vendor."

> Lander also indicated that, due to questions surrounding the DocGo contract, his office is currently reviewing whether there is a need to revoke a 2022 prior approval authorization the Comptroller's Office granted the Administration to utilize emergency procurement rather than seek specific prior approval for each individual contract.  Lander noted the prior authorization had not been intended as a blanket approval of any contract that any agency wishes to enter into, and that "after 18 months, this is no longer an unexpected situation that merits the broad suspension of due diligence processes to ensure that City funds are being spent wisely and with integrity."

84.     On this news, DocGo's stock price fell from a closing price of $5.70 per share on

September 15, 2023 to a closing price of $5.29 per share on September 18, 2023—a 7.19%

decrease.

85.     Finally, on January 10, 2024, Fuzzy Panda Research issued a report titled "DocGo

– Allegations of Fraudulent Billing Practices & Forging of Documents" which unveiled for the

first time the full extent of the wrongdoing, including the following summary:[4]

- Billing practices that former employees said amounted to Medi-Cal and Medicare Fraud.
- Lawsuits exposing multiple allegations of forging signatures on documents.
- Billing for covid tests that were not actually performed.
- Systematically editing patient reports to maximize profits.
- Culture of "cover-up rather than comply" where management cover-ups of mistakes and patient care issues.
- Terminating whistleblowers who spoke up against alleged "illegal acts" or offering payments that appear to amount to bribes.
- Leadership has a long history of lies and connections to fraudulent schemes.
  - Two key people were at companies that the DOJ charged with fraudulently over-billing the US government.
  - Another's business was caught up in the unraveling of the second largest ponzi scheme in history.
  - A CEO who cited his high ethics but recently resigned for lying about his resume.
  - And a Board of Directors whose backgrounds include multiple pump & dumps, penny stocks, delistings, reverse mergers, and connections to large ponzi schemes.
- DocGo's corporate structure includes:
  - Variable Interest Entities (VIE) which were made infamous by Enron to hide corporate losses.  We think DocGo is using their VIE to hide liabilities and losses.
  - Subsidiary going through a secretive "ABC liquidation" instead of a normal bankruptcy process.
    - Sources told us the ABC liquidation has unearthed massive liability claims of >$100 million at the subsidiary.
- Small no name auditor.
- Widely reported issues with the NYC migrant asylum contract include:
  - Abuse of and lying to migrants

---

[4] Emphasis from the original text has been removed.

- o  Potential related party dealings involving renting hotels managed by the CEO's brother and owned by individuals the DOJ recently charged with fraud.
  - o  Wasteful spending – including throwing away $39,000 a day of food meant for migrants
- Fundamentals of the core business are subpar with low gross margins and the company will lap all the one-time revenue benefits within 5 months.
  - o  Est[imated] that one time revenue will decline by ~90% as DocGo already lost a majority of the year 2 NY migrant asylum contract.
- Other fundamental patient care issues we discovered include:
  - o  Lying to government auditors.
  - o  Skipping or cheating on required certifications and trainings.
- DocGo's claims to be a tech and AI company yet:
  - o  CEO resigned after lying on his resume about obtaining degrees in AI.
  - o  The company's "AI subsidiary" in Estonia has only 1 full-time employee.
- Multiple government investigations have already begun into DocGo:
  - o  NYC comptroller launched a real-time audit of DocGo's work and expenses[.]
  - o  NY Governor's office and their Department of State launched their[] investigation.
  - o  NY Attorney General's office announced an investigation[.]

86.     In addition to the FP Report's identification of the Relocation Contract issues, the FP Report contains troubling information about the Defendants' failure to provide mission-critical oversight to meet its self-proclaimed purpose of providing "quality healthcare." The FP Report itemizes the Company's mission-critical failure to satisfy key healthcare requirements.  These oversight failures include: management turning a "'blind eye' to cheating on certification tests", DocGo's nurses "coaching financially struggling patients on how to get nurses to administer excessive Covid-19 vaccines to them in order to receive multiple $100 gift cards", and a whistleblower report from a New York City nurse revealing that the Company covered up that its nurses had given children "dangerous and improper" Covid vaccines

87.     On this news, DocGo's stock price fell from a closing price of $4.79 per share on January 9, 2024 to a closing price of $2.99 per share on January 10, 2024—a 37.58% decrease.

## AN INVESTOR FILES A SECURITIES CLASS ACTIONS

88.     On October 27, 2023, a purported purchaser of Company stock filed a securities class action complaint, captioned *Naclerio v DocGo Inc. et al.*, Case No. 1:23-cv-09476, in the United States District Court for the Southern District of New York against DocGo and Vashovsky, Capone, Oberholzer, Rosenberg, and Bienstock (the "*Naclerio* Complaint").   The *Naclerio* Complaint alleges that throughout the class period of November 8, 2022 to September 17, 2023, both dates inclusive, DocGo and the Securities Class Action Defendants made false and/or misleading statements regarding DocGo's inadequate executive hiring processes and the efficacy of the Company's mobile health and medical transportation services.

### THE INDIVIDUAL DEFENDANTS' MISCONDUCT
### DIRECTLY AND PROXIMATELY CAUSES DAMAGES TO DOCGO

89.     As a result of the Individual Defendants' misconduct, DocGo disseminated false and misleading public statements concerning DocGo's operations, prospects, and internal controls. This misconduct has devastated DocGo's credibility.

90.     As a direct and proximate result of the Individual Defendants' actions, DocGo has expended, and will continue to expend, significant sums of money defending and paying any settlement in the Securities Class Actions.

91.     As a direct and proximate result of the Individual Defendants' actions as alleged above, DocGo's market capitalization has been substantially damaged, losing millions of dollars in value because of the conduct described herein.

92.     Lastly, the actions of the Individual Defendants have irreparably damaged DocGo's corporate image and goodwill.  For at least the foreseeable future, DocGo will suffer from what is known as the "liar's discount," a term applied to the stocks of companies that have been implicated

in illegal behavior and have misled the investing public, such that DocGo's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

93.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued or joined in the pursuit of a common course of conduct and have acted in concert with and conspired with one another in furtherance of their wrongdoing.  The Individual Defendants caused the Company to conceal the facts as alleged herein.  The Individual Defendants further aided and abetted and assisted each other in breaching their respective duties.

94.     The purpose and effect of the conspiracy, common enterprise, and common course of conduct were, among other things, to (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment; (ii) conceal adverse information concerning the Company's operations, financial condition, future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price.

95.     The Individual Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company purposefully, recklessly, or with gross negligence to conceal material facts, fail to correct such misrepresentations, and violate applicable laws.  In furtherance of this plan, conspiracy, and course of conduct, Individual Defendants collectively and individually took the actions set forth herein.   The Individual Defendants described herein were direct, necessary, and substantial participants in the common enterprise, and common course of conduct complained here because the action described herein occurred under the authority and approval of the Board.

96.     Each of the Individual Defendants aided, abetted, and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with

actual or constructive knowledge of the primary wrongdoing, either took direct part in or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

97.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and DocGo and was at all times acting within the course and scope of such agency.

**PLAINTIFF HAS BEEN A STOCKHOLDER SINCE THE
ALLEGED WRONGDOING AND WILL FAIRLY AND ADEQUATELY
REPRESENT THE COMPANY'S AND ITS STOCKHOLDERS' INTERESTS**

98.     Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

99.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress the Individual Defendants' misconduct.

100.    Plaintiff is an owner of DocGo common stock and has been an owner of DocGo common stock since the wrongdoing alleged herein.

101.    Plaintiff will adequately and fairly represent the interests of the Company and its stockholders in enforcing and prosecuting the Company's rights.

**DEMAND IS FUTILE**

***Demand Is Futile Because Each Member of the
Board Faces a Substantial Likelihood of Personal Liability***

102.    At the time Plaintiff commenced this action, the Board consisted of the following seven directors: Bienstock, Burdiek, Katz, Leite, Smedra, Tendler, and Travers (the "Demand Directors"). Demand on the Board is excused because the Demand Defendants are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

103.    The Demand Defendants all face a substantial likelihood of liability for their individual misconduct.  The Demand Defendants were directors throughout the time of the false and misleading statements and, as such, had a fiduciary duty to ensure the accuracy of the Company's SEC filings, press releases, and other public statements and presentations concerning DocGo's business, operations, prospects, internal controls, and financial statements.

104.    Moreover, the Demand Defendants owed and owe a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the Company's internal controls were sufficiently robust and effective and were being implemented effectively, and to ensure that the Board's duties were being discharged in good faith and with the required diligence and due care.  Instead, they knowingly and consciously reviewed, authorized, and caused the publication of the materially false and misleading statements discussed above that caused the Company's stock to trade at artificially inflated prices.

105.    Here, among other things, the Demand Defendants had inadequate systems in place to address the mission-critical health and safety problems plaguing the Company.  They also failed to implement and enforce adequate executive hiring practices to vet candidates and prevent disruptive executive turnover and overstated the efficacy of DocGo's mobile health and medical transportation services.

106.    Each of the Demand Defendants also approved the 2023 Proxy Statement and, therefore, faces a substantial likelihood of personal liability because of the false and misleading statements contained therein.

107.    The Demand Defendants face a substantial likelihood of personal liability because of their conscious and knowing authorization of false and misleading statements, their failure to timely correct such statements, their failure to take necessary and appropriate steps to ensure that

the Company's internal controls were sufficiently robust and effective and were being implemented effectively, and their failure to take necessary and appropriate steps to ensure that the Board's duties were being discharged in good faith and with the required diligence constitute breaches of the fiduciary duties of loyalty and good faith, for which the Demand Defendants face a substantial likelihood of liability.

108.    If the Demand Defendants were to bring a suit on behalf of DocGo to recover damages sustained as a result of this misconduct, they would expose themselves to significant liability.  For this reason, it would be futile for Plaintiff to make a demand on the Board.

### *The Audit Committee Defendants Face a Greater Likelihood of Personal Liability*

109.    The Audit Committee Defendants (Burdiek, Katz, and Smedra), as members of the Audit Committee during the Relevant Period, participated in and knowingly approved the filing of false financial statements.  More specifically, as members of the Audit Committee, the Audit Committee Defendants were obligated to, among other things, review and discuss earnings press releases and corporate practices with respect to earnings press releases and financial information and earnings guidance; review and discuss the Company's practices with respect to risk assessment and risk management and risks related to matters including the Company's financial statements and financial reporting processes and compliance; and oversee the Company's compliance program with respect to legal and regulatory requirements.  Instead, the Audit Committee Defendants, as members of the Audit Committee, failed to ensure the integrity of the Company's financial statements and financial reporting process and its systems of internal accounting and financial controls and other financial information provided by the Company, as required by the Audit Committee Charter.  For this reason, the Audit Committee Defendants cannot exercise disinterested business judgment in considering a demand.

### *The Governance Committee Defendants Face a Greater Likelihood of Personal Liability*

110.   The Governance Committee Defendants (Katz, Leite, and Smedra) are sophisticated members of the Board with substantial training and experience on corporate governance matters and the importance of accurate disclosures to the investing public. Accordingly, the Governance Committee Defendants had to have known about the problems with the Company's executive hiring processes and the efficacy of its mobile health and medical transportation services, among other things.  Additionally, the Governance Defendants are well aware of the importance of preventing insiders from trading on non-public information made available to them as officers and directors of the Company.  Therefore, the Governance Committee Defendants face a substantial likelihood of personal liability and cannot exercise disinterested business judgment in considering a demand to initiate and prosecute this action.

### *The Insider Trading Defendants Who Are Directors*
### *Face a Greater Likelihood of Personal Liability*

111.   Because of their positions as officers and/or board members, each of the Insider Trading Defendants on the Board (Bienstock, Tendler, and Travers) possessed material non-public information including, *inter alia*, that: (i) the Company's inadequate executive hiring processes did not fully review and vet the backgrounds and credentials of job candidates; (ii) DocGo's inadequate executive hiring processes made disruptive executive turnover more likely; (iii) DocGo overstated the efficacy of its mobile health and medical transportation services; (iv) DocGo ignored red flags on mission-critical health and safety issues, like falsely claiming to have performed Covid tests, (v) revelations of the foregoing were likely to harm the Company's reputation and subject it to significant regulatory scrutiny that would negatively impact its finances; and (vi) as a result, the Individual Defendants' positive statements about the Company's

business, operations, and prospects were materially false, misleading, and lacked a reasonable basis.

112.    Bienstock, Tendler, and Travers unlawfully misused this information and unjustly enriched themselves by selling their shares at artificially inflated prices.  As a result, Bienstock's, Tendler's, and Travers' conduct harmed DocGo because they unjustly enriched themselves at the Company's expense.  Accordingly, because this action asserts claims for unjust enrichment against the Insider Trading Defendants and because the Bienstock, Tendler, and Travers face a substantial likelihood of liability for these claims as well as for their breaches of fiduciary duty to the Company, Bienstock, Tendler, and Travers are incapable of considering a demand to commence and vigorously prosecute this action.

***Other Reasons that Tendler Could Not Exercise Disinterested
and Independent Business Judgment in Considering a Demand***

113.    Additional facts show that Tendler is not independent.  *First*, the April 2023 Proxy concedes that Tendler is not independent.  *Second*, Tendler is not independent by virtue of his role as an officer in the Company since he serves as General Counsel.  For these reasons, Tendler could not exercise disinterested and independent business judgment in considering a demand.

**FIRST CAUSE OF ACTION**
**Against the Individual Defendants for Breach of Fiduciary Duties**

114.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

115.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of DocGo's business and affairs.

116.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

117. The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of DocGo.

118. In breach of their fiduciary duties to DocGo, the Individual Defendants willfully or recklessly made, or caused or permitted the Company to make, false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, (i) the Company's inadequate executive hiring processes did not fully review and vet the backgrounds and credentials of job candidates; (ii) DocGo's inadequate executive hiring processes made disruptive executive turnover more likely; (iii) DocGo overstated the efficacy of its mobile health and medical transportation services; (iv) DocGo ignored red flags on mission-critical health and safety issues, like falsely claiming to have performed Covid tests, (v) revelations of the foregoing were likely to harm the Company's reputation and subject it to significant regulatory scrutiny that would negatively impact its finances; and (vi) as a result, the Individual Defendants' positive statements about the Company's business, operations, and prospects were materially false, misleading, and lacked a reasonable basis.

119. Accordingly, DocGo's public statements were materially false, misleading, and lacked a reasonable basis during the Relevant Period, thereby causing the stock to trade at artificially inflated prices.

120. The Individual Defendants failed to and caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, thereby, rendering themselves personally liable to the Company for breaching their fiduciary duties.

121.    The Individual Defendants also failed to maintain an adequate system of oversight, disclosure controls, and procedures, and internal controls in breach of their fiduciary duties.

122.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements.   The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard to the truth in that they failed to ascertain and disclose such facts even though such facts were available to them.   Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities.

123.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain adequate internal controls.   The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained or acted with reckless disregard for the truth in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them.   Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities.   The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

124.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

125.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, DocGo has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

**SECOND CAUSE OF ACTION**
**Against the Securities Class Action Defendants**
**for Contribution under Sections 10(b) and 21D of the Exchange Act**

126.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

127.    DocGo and the Securities Class Action Defendants (Bienstock, Capone, Oberholzer, Rosenberg, and Vashovsky) are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) of the Exchange Act and SEC Rule 10b-5.  If the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to the Securities Class Action Defendants' willful or reckless violations of their obligations as officers and/or directors of DocGo.

128.    Because of their positions of control and authority as officers and/or directors of DocGo, the Securities Class Action Defendants were able to and did, directly or indirectly, exercise control over the business and corporate affairs of DocGo, including the wrongful acts complained of herein and in the Securities Class Action.

129.    Accordingly, the Securities Class Action Defendants are liable under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), which creates an implied private right of action for contribution and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

130.    As such, DocGo is entitled to receive all appropriate contribution or indemnification from the Securities Class Action Defendants.

**THIRD CAUSE OF ACTION**
**Against the Individual Defendants for**
**Violations of § 14(a) of the Exchange Act and SEC Rule 14a-9**

131.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

132.    Rule 14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

133.    The 2023 Proxy Statement violated Section 14(a) and Rule 14a-9 because it solicited DocGo stockholder votes for, *inter alia*, director reelection, while simultaneously misrepresenting and failing to disclose to investors that: (i) the Company's inadequate executive hiring processes did not fully review and vet the backgrounds and credentials of job candidates; (ii) DocGo's inadequate executive hiring processes made disruptive executive turnover more likely; (iii) DocGo overstated the efficacy of its mobile health and medical transportation services; (iv) DocGo ignored red flags on mission-critical health and safety issues, like falsely claiming to have performed Covid tests, (v) revelations of the foregoing were likely to harm the Company's reputation and subject it to significant regulatory scrutiny that would negatively impact its finances; and (vi) as a result, the Individual Defendants' positive statements about the Company's business, operations, and prospects were materially false, misleading, and lacked a reasonable basis.

134. The Individual Defendants made untrue statements of material facts and omitted to state material facts necessary to make the statements that were made not misleading in violation of Section 14(a) and Rule 14a-9.  By virtue of their positions within the Company and roles in the process and in the preparation of the 2023 Proxy Statement, the Individual Defendants were aware of this information and of their duty to disclose this information in the 2023 Proxy Statement.

135. The Individual Defendants knew that the statements contained in the 2023 Proxy Statement were materially false and misleading.

136. The omissions and false and misleading statements in the 2023 Proxy Statement are material in that a reasonable stockholder would consider them important in deciding how to vote on the re-election of directors.  Indeed, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the 2023 Proxy Statement and in other information reasonably available to stockholders.

137. As a direct and proximate result of the dissemination of the false and misleading 2023 Proxy Statement that the Individual Defendants used to obtain stockholder approval of and thereby re-elect directors, Nominal Defendant DocGo suffered damage and actual economic losses (*i.e.*, wrongful re-election of directors) in an amount to be determined at trial.

### FOURTH CAUSE OF ACTION
### <u>Against the Individual Defendants for Unjust Enrichment</u>

138. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

139. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made or caused to be made, the Individual Defendants were unjustly enriched at the Company's expense and to its detriment.

140.    The Individual Defendants benefitted financially from the improper conduct, received unjustly lucrative bonuses tied to the false and misleading statements, and received bonuses, stock options, or similar compensation from DocGo that was tied to the performance or artificially inflated valuation of DocGo, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

141.    Plaintiff, as a stockholder and representative of DocGo, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits—including from insider sales, benefits, and other compensation, including any performance-based or valuation-based compensation—obtained by the Individual Defendants from their wrongful conduct and breach of their fiduciary duties.

**FIFTH CAUSE OF ACTION**
**Against the Individual Defendants for Waste of Corporate Assets**

142.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

143.    In breach of their fiduciary duties, the Individual Defendants willfully, or in the alternative recklessly, made, or caused or permitted the Company to make, false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, (i) the Company's inadequate executive hiring processes did not fully review and vet the backgrounds and credentials of job candidates; (ii) DocGo's inadequate executive hiring processes made disruptive executive turnover more likely; (iii) DocGo overstated the efficacy of its mobile health and medical transportation services; (iv) DocGo ignored red flags on mission-critical health and safety issues, like falsely claiming to have performed Covid tests, (v) revelations of the foregoing were likely to harm the Company's reputation and subject it to significant regulatory scrutiny that would negatively impact its finances; and (vi) as a result, the Individual Defendants' positive statements

about the Company's business, operations, and prospects were materially false, misleading, and lacked a reasonable basis.

144.    As a result of the foregoing misconduct, the Individual Defendants wasted, caused, or will cause the waste of corporate assets by, *inter alia*, incurring many millions of dollars of legal liability and defense and litigation costs to defend legal actions (evidenced, for example, by the Securities Class Action), incurring costs for internal investigations, losing financing from investors and business from future customers who no longer trust the Company and its products, and approving excessive compensation and salaries tied to the Company's purported success or false credentials of its officers.

145.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

**SIXTH CAUSE OF ACTION**
**<u>Against the Individual Defendants for Aiding and Abetting</u>**

146.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

147.    Each of the Individual Defendants acted and is acting with knowledge of, or with disregard to, the fact that the Individual Defendants are in breach of their fiduciary duties to DocGo and has participated in a conspiracy in breach of fiduciary duties.

148.    In committing the wrongful acts alleged herein, each of the Individual Defendants has pursued, or joined in the pursuit of, a common course of conduct.  The Individual Defendants have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to pursuing the wrongful conduct that gives rise to their primary liability, the Individual Defendants also aided, abetted, and assisted each other in breaching their respective duties.

149.    The Individual Defendants collectively and individually initiated and followed a course of conduct that violated the federal securities laws; authorized corporate actions to serve their own personal interests rather than the interests of the Company and its stockholders; misrepresented material facts about the Company, its financial condition, and business prospects; prevented the disclosure of material information necessary to make statements complete and accurate; and failed to implement and maintain an adequate system of internal controls and corporate governance practices.

150.    The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and common course of conduct was, among other things, to (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment; (ii) conceal adverse information concerning the Company's operations, financial condition, future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price.

151.    Each of the Individual Defendants played a direct, necessary, and substantial part in the conspiracy, common enterprise, and common course of conduct complained of herein.

152.    Each of the Individual Defendants aided, abetted, and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, the Individual Defendants acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and were aware of their overall contributions to and furtherance of the wrongdoing.

153.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and DocGo and was at all times acting within the course and scope of such agency.

## SEVENTH CAUSE OF ACTION
### Against the Insider Trading Defendants for
### <u>Insider Selling and Misappropriation of Information</u>

154.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

155.    At the time of their stock sales set forth herein, the Insider Trading Defendants (Bienstock, Capone, Oberholzer, Tendler, and Travers) knew of the information described above and sold DocGo common stock on the basis of such information.

156.    The information described above was proprietary non-public information concerning the Company.  It was a proprietary asset belonging to the Company, which the Insider Trading Defendants used for their own benefit when they sold DocGo common stock.

157.    The Insider Trading Defendants' sales of Company common stock while in possession and control of this material adverse non-public information was a breach of their fiduciary duties of loyalty and good faith.

158.    Because the use of the Company's proprietary information for their own gain constitutes a breach of Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits that the Insider Trading Defendants obtained thereby.

## <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff demands judgment as follows:

A.    Declaring that Plaintiff may maintain this derivative action on behalf of DocGo and that Plaintiff is a proper and adequate representative of the Company;

B.    Awarding the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties and violations of the federal securities laws;

C.    Ordering the Insider Trading Defendants to disgorge monies obtained as a result of their sale of DocGo stock while in possession of insider information as described herein;

D.      Awarding prejudgment interest to the Company;

E.      Granting appropriate equitable relief to remedy Individual Defendants' breaches of fiduciary duties and other violations of law;

F.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees and costs and expenses; and

G.      Granting such other and further relief as the Court deems just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated:  May 30, 2024                              Respectfully submitted,


                                                  */s/ J. Brandon Walker*
                                                  J. Brandon Walker  (# JW0506)
                                                  Melissa A. Fortunato (#MF0214)
                                                  Gabriela A. Cardé (#5763156)
                                                  BRAGAR EAGEL & SQUIRE, P.C.
                                                  810 7th Avenue, Suite 620
                                                  New York, New York 10019
                                                  Tel: (212) 308-5858
                                                  Fax: (212) 214-0506
                                                  Email: walker@bespc.com
                                                          fortunato@bespc.com
                                                          carde@bespc.com

                                                  Badge Humphries (*pro hac vice forthcoming*)
                                                  BRAGAR EAGEL & SQUIRE, P.C.
                                                  2113 Middle Street, Suite 305
                                                  Sullivan's Island, SC 29482
                                                  Tel: (843) 883-7424
                                                  Email: humphries@bespc.com

                                                  *Attorneys for Plaintiff Ryne Shetterly*

**VERIFICATION**

I, Ryne Shetterly, hereby verify that I have authorized the filing of the attached Verified Stockholder Derivative Complaint ("Complaint"). I have reviewed the allegations made in the Complaint, and as to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and, for that reason, believe them to be true. I further verify that I am a current holder, and have been a holder, of DocGo, Inc. common stock since the time of Defendant's wrongdoing alleged in the complaint. I declare under penalty of perjury that the foregoing is true and correct.

Executed this 29 day of May 2024.

*Ryne Shetterly*
Ryne Shetterly (May 29, 2024 10:15 PDT)

Ryne Shetterly